UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| GRAY CONSTRUCTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 17-484-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| ENVIROTECH CONSTRUCTION | ) | **MEMORANDUM OPINION** |
| CORP., | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This action concerns the construction of a 200,000 square foot space for "More Than A Bakery" in Versailles Kentucky ("the Project"). Plaintiff Gray Construction ("Gray") and Counterclaim Defendant Travelers Casualty and Surety Company of America ("Travelers") have moved for summary judgment against Defendant Envirotech Construction Corp. ("Envirotech"). [Record No. 66] The motion will be granted, in part.

As discussed more fully below, Envirotech breached the parties' contract by: (i) failing to provide enough properly skilled workers for the project; (ii) failing to comply with the safety measures included in the Subcontract; (iii) failing to adhere to the Schedule of Work; and (iv) abandoning the Project. Gray did not breach the parties' contract nor violate the covenant of good faith. The Court also concludes that Envirotech did not file an illegal lien because there was nothing to indicate at the time of filing that the lien amount was inflated. Finally, Envirotech cannot seek delay damages.

# I.

Gray, the general contractor for the Project, entered into a contract with Envirotech on September 6, 2016, under which it agreed to provide all labor and materials necessary for the installation of insulated metal panels ("the Subcontract"). [Record Nos. 66-1] The parties agreed that Envirotech would be paid $3,200,449 under the Subcontract. [Record No. 66-1, p. 1] Envirotech agreed to provide installation of the exterior insulated metal panels within 45 business days of the commencement of Envirotech's work and the interior insulated metal panels within 30 days of the start of its work. [Record No. 66-1, p. 53]

Gray alleged that Envirotech was in default under the terms of the Subcontract and withheld payment. [Record No. 1] It provided five formal Notices of Default/Cure under the Subcontract. [Record Nos. 66-4, 66-7, 66-11, 66-17, 66-25] Gray terminated the Subcontract after Envirotech abandoned the Project. [Record No. 66-27]

Gray informally notified Envirotech of its alleged breach of the Subcontract and provided an opportunity to cure on February 23, 2017. [Record No. 66-3] It explained that there were recurring safety violations and that work could not continue until there was an acceptable safety action plan. [Record No. 66-3] Gray issued its first formal Notice of Default/Cure the following day, asserting that Envirotech failed to supply enough properly skilled workers, failed to take reasonable safety precautions with respect to the performance of the Subcontract, and failed to otherwise comply with safety measures initiated by Gray. [Record No. 66-4] Gray requested that Envirotech correct the problems and provide a corrective action plan by March 1, 2017. [Record No. 66-4] In response, Envirotech admitted the safety violations and submitted a corrective action plan. [Record Nos. 66-5; 71-10, pp. 1, 4]

However, Gray issued a second Notice of Default/Cure approximately three weeks later (on March 21, 2017) based on Envirotech's failure to complete the exterior insulated metal panels by the date set forth in the Schedule of Work, for for continuing in its failure to supply enough properly skilled workers and maintain the Schedule of Work. [Record No. 66-7] Gray also noted that Envirotech deficiencies were adversely affecting the progress of the Project. [Record No. 66-7] Gray sent a follow-up e-mail asserting that there were more issues with scheduling and that Envirotech had not submitted daily reports for two months. [Record No. 66-8] In response to these complaints, Envirotech admitted it was behind schedule and requested an extension of time to complete the exterior work. [Record No. 71-8, pp. 1, 4] It also noted that it had been delayed in its performance by others since the beginning of the Project and that unstable weather conditions were causing further delays. [Record No. 71-8, pp. 1-3] Envirotech further stated that Gray's Site Manager (Rob Shipp) committed to help Envirotech finish installation of exterior panels by March 24, 2017, but did not remove all of the obstacles necessary to finish the installation. [Record No. 71-8, p. 4]

On March 31, 2017, Gray issued a third Notice of Default/Cure. It again asserted that Envirotech was in default for failing to supply enough properly skilled workers and for failing to maintain the Schedule of Work. [Record No. 66-11] Gray reminded Envirotech of its right to contract with additional parties to perform any part of Envirotech's work to complete the Project in a timely manner. [Record No. 66-11] Envirotech did not respond to the third Notice. [Record No. 66-12, p. 34] Gray then contacted another company (Hayden Steel Erectors) in early April 2017 to assist in installing the insulated metal panels. [Record No. 66-13] Gray also contacted Southwest Vault Builders, Inc. to provide further assistance. [Record No. 66-14]

A fourth Notice of Default/Cure was issued on April 27, 2017, advising Envirotech of its continued default and of the adverse effect of Envirotech's actions on the Project. [Record No. 66-17] And once again, Gray reminded Envirotech that could hire additional contractors to perform any part of the work to timely complete its part of the Project. [Record No. 66-17] Again, however, Envirotech did not respond. Gray then hired American Igloo Builders, Inc., on May 5, 2017, to assist in installing the insulated metal panels. [Record No. 66-18] Envirotech's President and CEO, Janet Charles, e-mailed Gray on May 5, 2017, to discuss Gray's retention of American Igloo Builders, Inc. and payment. [Record No. 66-18]

Gray followed-up with Envirotech on May 16, 2017, to again warn that Envirotech's actions were delaying progress and completion of the Project. [Record No. 66-19] Gray then hired another contractor (Delta-T) to assist with the installation of the insulated metal panels. [Record No. 66-20] Gray notified Envirotech on July 19, 2017, that it was substantially behind schedule and of its continuing failure to provide manpower necessary to complete the work. [Record No. 66-21]

Envirotech submitted pay applications on May 25, 2017, June 25, 2017, and July 25, 2017. [Record No. 66, p. 10] Gray paid part of the May 25, 2017 application, but withheld payment for the other two. [Record No. 66-23, p. 19] Envirotech stopped work on the Project on July 25, 2017, and removed its equipment. [Record No. 66-24] Gray issued a fifth Notice of Default/Cure on the same date, stating that it had repeatedly notified Envirotech of the default under the Subcontract for failing to supply enough properly skilled workers, failing to maintain the Schedule of Work, failing to satisfactorily cure the defaults, and the adverse effect of the default on the Project. [Record No. 66-25] The Notice indicated that Gray had the right to terminate the Subcontract and seek damages if Envirotech did not cure its breach. [Record

No. 66-25] Envirotech responded three days later and provided written notice of Gray's alleged wrongful withholding of payment. [Record No. 71-17]

Gray terminated the Subcontract on August 1, 2017, citing Envirotech's repeated defaults and refusals to cure. [Record No. 66-27] The Notice of Termination stated that Gray would deduct the costs incurred in performing Envirotech's work from any money due to Envirotech and noted that Envirotech was liable for any expenses exceeding the unpaid balance of the Subcontract. [Record No. 66-27] Envirotech recorded a mechanic's lien[1] for $682,949.99 on November 26, 2017, in Woodford County. [Record No. 66-28] Gray, as principal, and Travelers, as surety, executed and recorded a bond to release the lien under Kentucky Revised Statute § 376.100. [Record No. 23-3]

Gray filed this action on December 7, 2017, claiming that Envirotech breached the parties' contract and filed an illegal lien against More Than A Bakery. [Record No. 1] Gray also sought a declaratory judgment seeking to have the Court hold that it is not required to pay Envirotech but, instead, is entitled to payment from Envirotech. [Record No. 1] Envirotech answered and filed a counterclaim on January 26, 2018, alleging breach of contract against Gray. [Record Nos. 12, 39] Gray filed its motion for summary judgment on November 9, 2018. [Record No. 66] The matter has now been fully briefed.

The subcontract provisions relevant to the motion for summary judgment provide:

3.2 DUTY TO BE BOUND. The Subcontractor shall be bound by the Schedule of Work including, without limitation, the dates for Substantial Completion and Final Completion stated in Section 1.5 and revisions to the Schedule. The Subcontractor shall provide Gray with any requested scheduling information for the Subcontractor's Work. The Schedule of Work and all subsequent changes thereto shall be submitted to the Subcontractor in advance of the required performance.

---

[1] The Lien Statement is located at Woodford County Clerk Book No. ML8, pages 483-484.

3.3 SCHEDULE CHANGES. Subcontractor acknowledges that as construction progresses it may be necessary for Gray to change the sequential order and duration of the various activities, including those contemplated by this Agreement, to account for unanticipated delays, occurrences and other factors which act to alter Gray's original schedule. Gray may require Subcontractor, at no additional cost to Gray, to prosecute Subcontractor's Work in such sequence as the progress of other subcontractors and the Project schedule dictates. It is expressly understood and agreed that the scheduling and sequencing of the Work is an exclusive right of Gray and that Gray reserves the right to reschedule and resequence Subcontractor's Work from time to time as the demands of the Project require without any additional cost or expense to be paid to the Subcontractor. Subcontractor shall carry on its Work promptly, efficiently, and at a speed that will not cause delay in the progress of Gray's Work or Work of other Subcontractors. If, in the opinion of Gray, Subcontractor falls behind in the progress of the Work, Subcontractor may be directed to take such steps as deemed necessary to improve the rate of progress. These steps may include, without limitation, requiring Subcontractor to increase the number of shifts, personnel overtime operations, days of Work, equipment, plant, or other remedies. Subcontractor shall submit to Gray for Gray's approval a schedule demonstrating how the required rate of progress will be regained without additional costs to Gray.

3.4 PRIORITY OF WORK. Gray shall have the right to decide on the time, order and priority in which the various portions of Work shall be performed and all other matters relative to the timely and orderly conduct of the Subcontractor's Work. The Work will be performed as required by the composite construction schedule, which may be changed periodically by the project superintendent in order to maintain the overall schedule of Work.

[Record No. 66-1, p. 4]

5.2.6 GROUNDS FOR WITHHOLDING PAYMENT. Gray may withhold from monthly progress payments an amount sufficient to protect Gray because:

.1 Defective work has not been remedied; materials have not been furnished; clean up has not been performed;

. . .

.5 There exists reasonable doubt that Subcontractor's Work can be completed for the unpaid balance of the Subcontract Price;

.6 There exists reasonable doubt that Subcontractor's Work, due to its own action or inaction, will be completed on schedule or in accordance with the schedule;

.7 Subcontractor is not satisfactorily prosecuting the Work of this Agreement;

. . .

.10 Any other material breach of this Agreement by Subcontractor which has not been cured after notice from Gray.

[Record No. 66-1, p. 7]

6.1 CHANGES. Without nullifying this Agreement, Gray may by written Subcontract Work Authorization or Subcontract Change Order make changes in the Work within the general scope of this Agreement and the Subcontractor shall perform such changes. Adjustments in the Subcontract Price or Schedule of Work, if any, resulting from such changes shall be set forth in a Subcontract Change Order. A Subcontract Change Order is a written instrument prepared by Gray and signed by the Subcontractor stating their agreement upon the change in the scope of the Work, adjustment in the Subcontract Price or Schedule of Work. A Subcontract Work Authorization is a written instrument prepared by Gray directing a change in the Work and stating a proposed adjustment, if any, in the Subcontract Price or Schedule of Work or both. A Subcontract Work Authorization shall be used in the absence of agreement on the terms of a Subcontract Change Order. No such adjustment shall be made for any such changes performed by Subcontractor that have not been so ordered by Gray in writing, and approved by the Owner.

[Record No. 66-1, p. 9]

6.3 CLAIMS RELATING TO GRAY. The Subcontractor shall give Gray written notice of all claims . . . within five (5) calendar days of the beginning of the event for which claim is made; otherwise, such claims shall be deemed waived.

[Record No. 66-1, p. 9]

6.6 DELAY. If the progress of the Subcontractor's Work is substantially delayed without the fault or responsibility of the Subcontractor, then the time for the Subcontractor's Work shall be extended by Change Order to the extent obtained by Gray under the Contract Documents and the Schedule of Work shall be revised accordingly.

Gray shall not be liable to the Subcontractor for any damages or additional compensation as a consequence of delay, schedule impacts, hindrances, interference, acceleration, compression or other time related claims (collectively referred to as "schedule impacts") caused by any person not a party to this Agreement other than the Owner . . .

Under no circumstance, and notwithstanding anything to the contrary herein, Subcontractor shall not be entitled to seek from Gray additional compensation or damages for actual or alleged loss of efficiency, constructive acceleration, lost productivity, stacking of trades, home office overhead, expectant underrun, season change premium, extended overhead, impact damages, quantum meruit, profit upon damages for delay or similar damages calculated by formula or trade data or studies.

[Record No. 66-1, p. 10]

8.3 WORKMANSHIP. Every part of the Subcontractor's Work shall be executed in strict accordance with the Subcontract Documents in the most sound, workmanlike, and substantial manner. All workmanship shall be the best of its kind performed by others engaged in the same trade . . .

[Record No. 66-1, p. 11]

8.11 SAFETY PRECAUTIONS AND PROCEDURES.
8.11.1 The Subcontractor shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by Gray and, in addition, comply with occupational safety and other applicable laws, ordinances, rules, regulations and orders of public authorities for the safety of persons or property and in accordance with the requirements of the Subcontract Documents . . .

[Record No. 66-1, p. 12]

8.23 COORDINATION.  Subcontractor is responsible for coordinating its work areas and schedule with other trades in order to perform the overall project as a team.

[Record No. 66-1, p. 15]

11.1 DEFAULT: NOTICE TO CURE.  If the Subcontractor refuses or fails to supply enough properly skilled workers, proper materials, or maintain the Schedule of Work, or fails to achieve Substantial or Final Completion, or it fails to make prompt payment for its workers, sub-Subcontractors or suppliers, disregards laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, or fails to correct defective work as determined by Gray, or threatens to or refuses to perform, or fails to indemnify Gray as required by this Agreement or by law, or otherwise breaches any provision of this Agreement, and fails within three (3) working days after receipt of written notice to commence and continue satisfactory correction of such default with diligence and promptness, then Gray, without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies: (a) supply such number of workers and quantity of materials, equipment and other facilities as Gray deems necessary for the completion of the Subcontractor's Work, or any part thereof which the Subcontractor has failed to complete or perform after the aforesaid notice, and charge the cost thereof to the Subcontractor, who shall be liable for the payment of such costs, including reasonable overhead, profit, as well as for other damages, and attorney's fees and dispute resolution costs; (b) contract with one or more additional contractors to perform such part of the

Subcontractor's Work as Gray shall determine will provide the most expeditious completion of the total Work and charge the cost thereof to the Subcontractor; (c) withhold payment of any monies due the Subcontractor pending corrective action or completion of the Subcontractor's Work to the extent required by and to the satisfaction of Gray; (d) set-off Gray's damages attributable to Subcontractor's default against any monies due Subcontractor under this Agreement or under any other contract between Gray and the Subcontractor; and/or (e) terminate the Subcontract Agreement as set forth below.

[Record No. 66-1, p. 17]

17.6 ENTIRE AGREEMENT.  This Agreement is solely for the benefit of the signatories hereto and represents the entire and integrated agreement between the parties hereto and supersedes all prior contemporaneous negotiations, representations, understandings or agreements, either written or oral.  This Agreement shall not be modified except by a written instrument signed by the parties.

[Record No. 66-1, p. 28]

Subcontractor attests that the entire contract documents, as enumerated in this and other included exhibits, have been read and understood.  Furthermore, Subcontractor attests that they are fully familiarized, capable and intend to comply with all of the requirements for the full and complete performance of the work included in this contract.
Subcontractor agrees to be bound and obligated to Gray, to the extent of the work included in this contract, as fully and completely as Gray is bound and obligated to the Owner.  Subcontractor shall comply with Gray and the Owner's contractor policies.

[Record No. 66-1, Ex. A, p. 1]

**GENERAL REQUIREMENTS:**
. . .
16. The Subcontractor shall verify all existing conditions or work installed by others prior to the commencement of work.  Any deficiencies must be reported to Gray with adequate time for completion of corrections prior to the start of your work.
17. The Subcontractor will not cancel work activities due to weather, demobilize, adjust the crew size or change work schedules without first coordinating and notifying Gray's Site Manager.
18. The Subcontractor and all their lower-tiered subcontractors shall adhere to Gray's safety program, Gray's Haz-com program, and all state and federal OSHA regulations.
. . .

24. The Subcontractor understands that multiple mobilizations and/or setups to the jobsite will be required.
. . .
27. The Subcontractor shall prepare, maintain, and submit daily reports, quality assurance/quality control reports, safety checklists, weekly safety meeting minutes, and any other project specific reports as directed by Gray's Site Manager. Reports shall be submitted within the timeframes requested by Gray's Site Manager.
28. The Subcontractor shall coordinate its work with all other trades.
. . .
36. The Subcontractors understands that an effort will be made to assign temporary staging areas that will require minimum handling. The subcontractor also understands that subcontractors and equipment vendors/installers will be asked to move staging areas, materials, and equipment that hinder the progress of the project.
. . .
40. The Subcontractor shall be entitled to additional compensation only by an approved change order requests on forms provided by or approved by Gray. Any additional work outside the scope of this contract must be verified and approved by authorized Gray representatives. . .

[Record No. 66-1, Ex. A, p. 2-5]

### SCHEDULE REQUIREMENTS:
1. All work shall be performed in accordance with the most current Project Schedule, or as directed by Gray's Site Manager and/or Project Manager . . .
2. The subcontractor has reviewed and understands the project schedule, and takes responsibility for working the necessary weekends and overtime to maintain the project schedule.
. . .
4. Quantities and man hours worked shall be submitted with daily reports to Gray's Site Manager.
5. The Subcontractor shall work any overtime, weekends, or holidays required to maintain the Project Schedule. All associated costs are included in the subcontract amount.
6. The Subcontractor shall include the manpower, equipment, and work schedule necessary to support the construction schedule, including that needed to overcome the effects of any inclement weather.
. . .

[Record No. 66-1, Ex. A, p. 6]

## II.

Summary judgment is appropriate if there are no genuine disputes regarding any material facts and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52; *see Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).

Once the moving party has met its burden of production, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Keeneland Ass'n, Inc. v. Earnes*, 830 F. Supp. 974, 984 (E.D. Ky. 1993) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). The nonmoving party cannot rely on the assertions in its pleadings; rather, it must come forward with probative evidence to support its claims. *Celotex*, 477 U.S. at 324. In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 58.

## III.

### A.  Envirotech breached the Subcontract.

Gray claims that Envirotech first breached the Subcontract in March 2017 by failing to provide enough properly skilled workers, failing to comply with the safety measures included

in the Subcontract, failing to adhere to the Schedule of Work, and by abandoning the Project. [*See* Record Nos. 66-4, 66-7, 66-11, 66-17, 66-25.]

"It is well settled that the interpretation of contracts is an issue of law for the court to decide." *Equitania Ins. Co. v. Slone & Garrett, P.S.C.*, 191 S.W.3d 552, 556 (Ky. 2006). The Court should protect parties' freedom to contract and try to "effectuate the intentions of the parties" when interpreting contracts. *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 381 (Ky. 2002). The Court must decide if any portions of a contract are ambiguous. *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105-06 (Ky. 2003). "A written instrument will be enforced strictly according to its terms" if the terms are not ambiguous. *Id*. at 106. Summary judgment is appropriate when a court is interpreting the legal effect of unambiguous contract language. *Zetter v. Griffith Aviation, Inc*., 435 F. Supp. 2d 622, 628-29 (E.D. Ky. 2006).

The Subcontract required Envirotech to adhere to Gray's safety program, verify and accept all work installed by others, "prepare, maintain and submit daily reports, quality assurance/quality control reports, weekly safety meeting minutes, and any other project specific reports as directed by Gray's site manager." [Record No. 66-1, Ex. A, p. 4] It further required that Envirotech work in accordance with the Project schedule and work overtime if necessary to adhere to the Project schedule. [Record No. 66-1, Ex. A, p. 1] The Subcontract also required Envirotech to timely design services, and execute its work in "the most sound, workmanlike, and substantial manner." [Record No. 66-1, p. 11]

It is undisputed that Gray sent multiple Notices of Default/Cure for violations of the Subcontract. [Record Nos. 66-4, 66-7, 66-11, 66-17, 66-25] Originally, it noted that Envirotech failed to provide enough properly skilled workers, failed to take reasonable safety precautions, and failed to comply with safety procedures. [Record No. 66-4] Gray requested

that Envirotech cure its default and Envirotech provided a corrective action plan. [Record No. 66-5] However, Gray maintained that Envirotech continued in its failure to supply enough properly skilled workers and that Envirotech did not maintain the Schedule of Work. [Record No. 66-6] Gray filed a second Notice of Default/Cure and Envirotech admitted it was behind schedule and made a formal request for an extension of time. [Record Nos. 66-7; 66-9] Gray issued a third Notice of Default/Cure and Envirotech did not respond. [Record Nos. 11; 66-12, p. 34] Gray then issued a fourth Notice of Default/Cure. [Record No. 66-17]

Gray supplemented Envirotech's work in adherence with the Subcontract after the third Notice of Default/Cure. [*See, e.g*., Record Nos. 66-1; 66-13; 66-14] Gray also hired three companies to assist in finishing Envirotech's work after the third and fourth Notice of Default/Cure. [Record Nos. 66-13; 66-14; 66-18] Envirotech never disputed Gray's choice to hire more workers to install the insulated metal panels after the third Notice of Default/Cure. [*See* Record No. 66-12, pp. 34-36.] Instead, Envirotech e-mailed Gray to inquire about one of the supplementing companies, American Igloo, after the fourth Notice of Default/Cure. [Record No. 66-18] Gray withheld payment in accordance with the Subcontract when Envirotech remained behind schedule as of July 25, 2017. [Record Nos. 66-21; 66-1, pp. 7, 17] Envirotech stopped work on the Project the same day, without issuing a Notice of Default or asking Gray for performance assurance. [Record Nos. 66-24; 66-12, p. 12]

Gray submitted a fifth Notice of Default/Cure for Envirotech's continued failure to supply enough properly skilled workers, failure to maintain the Schedule of Work, and failure to satisfactorily cure the defaults. Envirotech provided written notice of Gray's alleged breach of the Subcontract and for allegedly wrongful withholding of payments on July 28, 2017. [Record No. 71-17]

The evidence identified by Gray establishes that it notified Envirotech of its breach of contract and gave Envirotech the opportunity to cure on multiple occasions. [Record Nos. 66-4, 66-7, 66-11, 66-17, 66-25] Envirotech has not cited to any evidence in response to dispute these issues. In fact, at multiple points, Envirotech admits to being behind schedule with its work on the Project. [*See, e.g.,* Record Nos. 71-8; 66-12, p. 38.] Accordingly, the evidence provided by Gray shows Envirotech did not maintain the Schedule of Work, failed to provide enough properly skilled workers, and abandoned the project. Envirotech was in breach of multiple provisions of the Subcontract and Gray is entitled to summary judgment as a matter of law on Count I of the Complaint.

### B. Gray did not breach the Subcontract and is entitled to summary judgment on Envirotech's breach of contract claim.

Envirotech claims that Gray breached the contract in several ways. First, it contends that Gray withheld payment in violation of the Subcontract and wrongfully shifted responsibility of its own failures onto Envirotech.[2] Envirotech's President and CEO Janet Charles asserts in her deposition that Gray breached the Subcontract because of all of the delays caused by Gray, by withholding payment, and by not granting Envirotech's Change Orders and requests for extensions of time. [Record No. 66-12, p. 23] She also contends that Gray violated the duty of good faith. However, Gray did not breach the Subcontract and even if it had done so, Envirotech waived its right to bring claims against Gray.

      i.   <u>Gray did not breach the Subcontract because Envirotech agreed to multiple contract provisions assuming the risk of delays and allowing Gray to reschedule work.</u>

---

[2] Envirotech has seemingly abandoned the argument that Gray violated the condition precedent to initiating litigation discussed in its response to the motion to strike the jury demand. [Record No. 69]

It is well-established under Kentucky law that "a party who commits the first breach of a contract is deprived of the right to complain of a subsequent breach by the other party." *Williamson v. Ingram*, 49 S.W.2d 1005, 1006 (Ky. 1932); *see also Hall v. Rowe,* 439 S.W.3d 183 (Ky. Ct. App. 2014) ("Kentucky case law adheres to the fundamental principle in the law of contracts that before one may obtain the benefits the contract confers upon him, he himself must perform the obligation which is imposed upon him." (citations and quotations omitted)). Envirotech argues that Gray breached the Subcontract by causing multiple delays. Specifically, it contends that Gray: (i) failed to eliminate unfavorable site conditions; (ii) failed to assign temporary staging areas; (iii) failed to require other subcontractors to remove stored objects; (iv) failed to adhere to the initial sequence of work; (v) failed to ensure that predecessor activities were done timely and adequately; (vi) caused delays ; and (vii) failed to correct inadequacies that prevented Envirotech from panel installation.  [Record Nos.  66-12, p. 23; 71-12, pp. 4-6]  Notwithstanding these claims, Envirotech agreed that it would "verify and accept all existing conditions or work installed by others prior to the commencement of work."  [Record No. 66-1, Ex. A, p. 4]  Any deficiencies in existing conditions were required to have been reported to Gray.  [Record No. 66-1, Ex. A, p. 4]   Further, the Subcontract states that "the Subcontractor warrants and represents that it has visited the site of the proposed Work, has familiarized itself with existing conditions and the character of the operations to be carried on under this Agreement and that it fully understands the facilities, difficulties, and restrictions attending the execution of the work."  [Record No. 66-1, p. 3]

Envirotech also argues that Gray violated the provision noting that "the Subcontractor understands that an effort will be made to assign temporary staging areas that will require minimum handling.  The subcontractor also understands that subcontractors and equipment

vendors/installers will be asked to move staging areas, materials, and equipment that hinder the progress of the project." [Record No. 66-1, Ex. A, p. 5]

Gray Site Manager Rob Shipp testified that Gray did make some effort to provide a staging area. [Record No. 74-1, p. 10] According to Shipp, Gray built a stone road around the perimeter of the job site and provided a stone staging pad in response to Envirotech's e-mail request. [Record No. 74-1, p. 10] Additionally, Envirotech agreed to multiple provisions that gave Gray the right to make schedule changes, reschedule and resequence work, and prioritize various portions of the work. [Record No. 66-1, p. 4] Envirotech also agreed that the "Subcontractor is responsible for coordinating its work areas and schedule with other trades in order to perform the overall project as a team." [Record No. 66-1, p. 15, *see also* Record No. 66-1, Ex. A, p. 5.] Further, Envirotech agreed that it "would not cancel any work activities due to weather, demobilize, adjust the crew size or change work schedules without first coordinating and notifying Gray's Site Manager." [Record No. 66-1, Ex. A, p. 4]

"If the contract is so clear and free from ambiguity as to be self-interpretative, no construction is necessary but it should stand as it is written and should be enforced according to its express terms . . . ." *Veech v. Deposit Bank of Shelbyville*, 128 S.W.2d 907, 911 (Ky. 1939). Envirotech expressly agreed that Gray had the exclusive right to make changes to the schedule and scope of work. As a consequence, it cannot now claim that Gray breached the Subcontract based on delays in the schedule, resequencing of the work, and weather conditions. Further, if Envirotech had issues with the delayed start date it was required to give written notice of its claims within five days of the beginning of the events for which the claims were made; otherwise Envirotech waived its claims. [Record No. 66-1, p. 9] Despite this requirement, Envirotech never sent a Notice of Default/Cure. [Record No. 66-12, p. 12]

Envirotech also expressly agreed to work harmoniously with other contractors on the Project and it failed to raise any such concerns contemporaneously with Gray.  [Record No. 66-1, p. 15]

      ii.    <u>Gray did not breach the Subcontract by withholding payment.</u>

Envirotech also argues that Gray wrongfully withheld payment by not fully remitting the pay applications for May 25, 2017, June 25, 2017, and July 25, 2017.  However, the Subcontract permitted Gray to "withhold from monthly progress payments an amount sufficient to protect Gray" for multiple reasons, including: (i) if defective work had not been remedied, (ii) if there is reasonable doubt that the Subcontractor's work will not be completed on schedule, (iii) if the Subcontractor is not satisfactorily completing the Work, or (iv) any other breach of the Subcontract agreement that was not cured after notice from Gray.  [Record No. 66-1, p. 7]  Further,  the Subcontract also provides that Gray had the right to "withhold payment of any monies due the Subcontractor pending correction action or completion of the Subcontractor's Work to the extent required by and to the satisfaction of Gray."  [Record No. 66-1, p. 17]  Thus, it was within Gray's power under the Subcontract to withhold payment for Envirotech's breach of the Subcontract.  [Record No. 66-1, pp. 7, 17]

As previously explained, Envirotech was in breach of the Subcontract and never cured its breaches.  Gray notes that, in Kentucky, "the party first guilty of a breach of contract cannot complain if the other party thereafter refuses to perform."  [Record No. 66, p. 16 (quoting *Dalton v. Mullins*, 293 S.W.2d 470, 476 (Ky. 1956).]  As explained above, Envirotech was in breach of the Subcontract for failing to provide enough properly skilled workers, failing to adhere to the Schedule of Work, and finally for abandoning the Project.  Therefore, Envirotech

cannot claim Gray breached the Subcontract by withholding payment when it was first to breach the agreement.

> iii. Gray did not breach the Subcontract by failing to approve Envirotech's requested Change Orders.

Envirotech requested five Change Orders, but Gray did not sign and approve them. [Record No. 66-31] Envirotech claims that Gray breached the Subcontract by failing to approve the Change Orders authorizing additional work outside of the Scope of Work and for payment. [Record No. 66-30] The Subcontract allows a Subcontractor to request a Change Order but "[a]ny additional work outside the scope of th[e] contract must be verified and approved by authorized Gray representatives." [Record No. 66-1, Ex. A, p. 5]

Envirotech argues that Gray is the only impediment to Envirotech getting relief under the Change Orders. [Record No. 66-12, p. 16] Gray argues that the Subcontract does not require Gray to sign the Change Orders and that unsigned Change Orders are invalid. As previously noted, Envirotech agreed to all of the provisions of the Subcontract, including the provision that Change Orders must be in writing and approved by Gray. If the terms of a contract are not ambiguous the "written instrument will be enforced strictly according to its terms." *Frear v. P.T.A. Indus., Inc.,* 103 S.W.3d 99, 106 (Ky. 2003). The provision regarding Change Orders is clear. Gray was not obligated to approve the Change Orders and the Change Orders are ineffective if Gray did not verify and approve them.

> iv. Envirotech is barred from introducing evidence of Gray's potential violations of pre-contract understandings under the parol evidence rule.

An unambiguous written agreement "is presumed to be final and complete, with all prior negotiations abandoned or incorporated into the final document." *Grass v. Akins*, 368 S.W. 3d 150, 153 (Ky. Ct. App. 2012) (citations omitted). Thus, "when parties reduce their

agreement to a clear, unambiguous, and duly executed writing, all prior negotiations, understandings, and agreements merge into the [written] instrument," which "cannot be modified or changed by prior parol evidence, except in certain circumstances such as fraud or mistake." *New Life Cleaners v. Tuttle*, 292 S.W.3d 318, 322 (Ky. Ct. App. 2009). Parol evidence "consists of evidence of agreements between or the behavior of the parties prior to or contemporaneous with the contract," including "evidence of a contemporaneous oral agreement on the same subject matter, verifying, modifying, contradicting, or enlarging a contract." *Luttrell v. Cooper Indus.*, 60 F. Supp. 2d 629, 631 (E.D. Ky. 1998).

Envirotech claims that Gray violated pre-contract "understandings" or "expectations." [Record No. 66-12, p. 23-27] However, the parties included an integration clause in their contract stating that the Subcontract "represents the entire and integrated agreement between the parties hereto and supersedes all prior contemporaneous negotiations, representations, understandings or agreements, either written or oral." [Record No. 66-1, p. 28] The contract also included a list of documents that were incorporated by reference which did not include the alleged "understandings." [Record No. 66-1, p. 28] The parties' final written contract was unambiguous and Envirotech cannot now claim pre-contract "understandings" were violated when the "understandings" were omitted from the final, integrated agreement.

     v.    <u>Gray did not breach the covenant of good faith.</u>

Implicit in every contract in Kentucky is the covenant of good faith and fair dealing. This covenant has been interpreted to require the contracting parties to do everything necessary to carry out the contract. *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, 941 F. Supp. 2d 807, 816 (E.D. Ky. 2013) (citations and quotation marks omitted). However, a complaining party must "provide evidence sufficient to support a conclusion that

the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties" to establish a breach of the covenant of good faith. *O'Kentucky Rose B. Ltd. P'ship v. Burn*s, 147 F. App'x 451, 458 (6th Cir. 2005). The "implied covenant of good faith and fair dealing does not prevent a party from exercising its contractual rights." *Farmers Bank & Trust Co. v. Willmott Hardwoods, Inc.,* 171 S.W.3d 4, 11 (Ky. 2005). But "[a] contracting party impliedly obligates himself to cooperate in the performance of his contract and the law will not permit him to take advantage of an obstacle to performance which he has created or which lies within his power to remove." *PBI Bank, Inc. v. Signature Point Condos. LLC*, 535 S.W.3d 700, 718 (Ky. Ct. App. 2016) (quoting *Ligon v. Parr*, 471 S.W.2d 1, 3 (Ky. 1971)).

Envirotech argues that Gray issued Notices of Default/Cure in bad faith. It cites an e-mail from Rob Shipp stating that Envirotech had more workers and equipment than a usual job. [Record No. 71-20] However, the purpose of the e-mail was to raise concerns about Envirotech's performance and it does not include information regarding the workers' skill levels. [Record No. 71-20] The e-mail also notes that Envirotech had caused excessive damages due to mishandling of the insulated metal panels, and that Gray had to educate and enforce proper handling and guidelines. [Record No. 71-20] Envirotech further asserts that Gray never addressed its "delay-causing conduct," but, as previously explained, Envirotech had assumed the risk of delays and rescheduling of work.

Gray is entitled to summary judgment on Envirotech's breach of contract claim.

### C. Envirotech did not file an illegal lien in violation of Kentucky Revised Statute § 434.155.

Gray contends that Envirotech violated Kentucky Revised Statute § 434.155 when it filed the mechanic's lien in November 2017. Specifically, it claims that the lien amount was inflated because it included charges for Envirotech's subcontractors that Gray had paid prior to the filing of the lien. Section 434.155 states that "[a] person is guilty of filing an illegal lien when he files a document or lien that he knows or should have known was forged, groundless, contained a material misstatement, or was a false claim. It shall be an affirmative defense that any material misstatement was not intentional."

"Kentucky has codified the common law negligence *per se* doctrine and created an avenue by which an individual may seek relief even where a statute does not specifically provide a private remedy." *Vanhook v. Somerset Health Facilities, LP*, 67 F. Supp. 3d 810, 817 (E.D. Ky. 2014). The common law negligence *per se* doctrine is codified through Ky. Rev. Stat. § 446.070 which:

> creates a private right of action under which a damaged party may sue for a violation of a statutory standard of care, provided that three prerequisites are met: first, the statute in question must be penal in nature or provide no inclusive civil remedy; second, the party [must be] within the class of persons the statute is intended to protect; and third, the plaintiff's injury must be of the type that the statute was designed to prevent.

*Id*. The Court of Appeals of Kentucky discussed using Ky. Rev. Stat. § 446.070 to create a private right of action for violations of Ky. Rev. Stat. § 434.155 in *Ford v. Faller*, 439 S.W.3d 173 (Ky. Ct. App. 2014). *See also Hickey v. GE Co.*, 539 S.W.3d 19, 24 (Ky. 2018) (noting that Ky. Rev. Stat. § 446.070 created a private right of action for a violation of Ky. Rev. Stat. § 434.155). It explained that the General Assembly's purpose "was to protect individuals from liens that are forged, false, or fraudulent." *Ford*, 439 S.W.3d at 181.

Gray believes that Envirotech knew that the lien figure included charges for work performed by subcontractors that Gray paid prior to Envirotech filing the lien. [Record No. 66, p. 19] Conversely, Envirotech contends that it computed the mechanic's lien based on information available at the time of filing the lien. [Record No. 71, pp. 14-15] Envirotech further argues that it "had no reason to suspect or believe that [the lien] was 'forged, groundless, contained a material misstatement, or was a false claim." [Record No. 71, pp. 18-19]

Envirotech filed the mechanic's lien on November 26, 2017, for $682,949.99. [Record No. 66-28] Janet Charles testified that she calculated the lien amount by looking at what Envirotech had billed to Gray through July 25, 2017, and then by looking at what payments Gray had made to Envirotech's vendors and deducting those from the amount Envirotech had billed to Gray. [Record No. 66-12, p. 12] She also added the amount included in Change Orders that had been sent to Gray, but had not been executed. [Record No. 66-12, pp. 13-14] Charles conceded that the lien was inflated by $575, but stated that may have been a typographical error. [Record No. 66-12, p. 16] Charles also testified that her review of Envirotech's billing system and accounting records gave her no reason to believe that Gray was paying any of Envirotech's vendors. [Record No. 66-12, p. 17] Charles conceded that Envirotech has not done anything to amend its lien even though it has been reduced by ten percent. [Record No. 66-12] The new lien amount at the time of Charles' deposition was $611,496.15. [Record No. 66-12, p. 21]

Gray has not identified evidence indicating that Envirotech knew the lien was inflated at the time of filing. While it may have come to light later that the lien was inflated, the relevant inquiry is the filer's knowledge at the *time of filing*. Ky. Rev. Stat. § 434.155

(emphasis added).  Accordingly, Envirotech is entitled to summary judgment on Gray's claim for filing an illegal lien.

### D.  Envirotech cannot seek delay damages.

Envirotech cannot seek delay damages because Gray did not breach the Subcontract. But even if Envirotech had established a breach of contract (or presented a genuine issue of fact regarding breach), it would not be entitled to delay damages because the company: (i) failed to provide documentation supporting its damage calculations and (ii) is barred from seeking such damages under the Subcontract.

a. <u>Envirotech cannot present evidence on delay damages because it failed to provide documentation supporting its delay damages calculation.</u>

Gray argues that Envirotech cannot seek delay damages because it originally indicated it would rely on an expert to calculate delay damages, but then failed to supplement its damages calculation.  Envirotech contends that following initial disclosures it realized it did not need an expert on damages and Gray is not prejudiced by not being notified of that fact.

Federal Rule of Civil Procedure 26(a)(1)(1)(iii) requires a party to provide its opposition with "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered."  Rule 26(e) requires parties to supplement disclosures under Rule 26(a) if they are incomplete or incorrect.  The parties' initial disclosures were due by March 18, 2018, and the close of discovery was October 1, 2018.  [Record No. 17, pp. 1-2] They were required to

supplement their initial disclosures ". . . no later than thirty days prior to the close of discovery." [Record No. 17, p. 2]

A plaintiff who fails to provide the information required by Rule 26(a), "is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The test for exclusion under Rule 37(c) is "very simple: the sanction is mandatory unless there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless." *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 370 (6th Cir. 2010) (internal quotations omitted).

Envirotech indicated in its Rule 26(a) disclosures that it sought damages resulting from delays and that the damages required expert quantification and testimony but estimated that damages resulting from delay were about $633,000. [Record Nos. 66-30, pp. 18-19; 66-12, p. 22] Expert disclosures were required by August 1, 2018. [Record No. 17, p. 1] Envirotech has not disclosed any expert witness and did not supplement its initial disclosures to include a damages calculation and materials on which the computation is based.

Charles testified during her September 18, 2018 deposition that Envirotech concluded it did not need an expert before the deadline for expert disclosures had passed. [Record No. 66-12, p. 22] Charles also testified that she believed that Gray knew that when Envirotech did not disclose an expert that it was going to come up with its own damages without an expert. [Record No. 66-12, p. 23] However, Envirotech did not produce the underlying documents in determining its calculation for delay damages. [*See* Record No. 66-12, p. 24-25.]

Charles testified that the delay damages are based on calculations of additional manpower costs required because of Gray's breaches of the Subcontract. [Record No. 71-18,

p. 9] She testified that the overall total of delay damages totaled $824,328.60. [Record No. 66-12, p. 24] Charles and the attorney for Gray walked through an itemization of the costs to reach that number. For example, Charles testified:

> A. . . . starting with the extra labor costs and loss of labor productivity, under both those captions and extra -- so extra labor costs and loss of labor productivity, I put the overtime costs associated with this job. That did not include for Hayden or Southwest Vault. And that number for overtime was 109,167.
> Q. Okay.
> A. Then for –
> Q. Hold on. Let me break that one up a little bit. What documents did you rely on in support of the 109,167.
> A. Actual costs that we have incurred either through our employees', you know, time sheets or actual payroll costs and then any labor, temp labor, that charged us for overtime.
> Q. Okay. Let me ask it a different way. Do any of the documents supporting that figure, do any of them have Envirotech's Bates stamp number on them in this litigation? Meaning has Envirotech produced them in this case?
> A. No.

[Record No. 66-12, p. 24] Additionally, Charles testified "no" in response to "[t]o calculate lost profits, none of those figures are in any of the documents produced already in discovery, are they?" [Record No. 66-12, p. 25] Further, she testified that no documents for rate differential had been produced nor had any documents for lost profitability for two other jobs Envirotech could have worked on been produced. [Record No. 66-12, p. 25]

The initial disclosure provided by Envirotech included a rough estimate and that it would need an expert to calculate damages. [Record No. 66-12, p. 23] However, at some point, Envirotech realized it would not need an expert, but failed to supplement its initial disclosures with a new computation of damages and did not provide the underlying documents relied upon in calculating its delay damages. [*See* Record No. 66-12, pp. 24-25.] The initial disclosures and lack of supplemental responses are insufficient under Rule 26 because they lack supporting

documentation to allow Gray to "independently analyze" Envirotech's claim for delay damages. *Bessemer*, 596 F.3d at 370. Envirotech failed to comply with its obligation under Rule 26.

Envirotech asserts that Gray would suffer no prejudice by allowing delay damages because it is not attempting to disclose a testifying expert beyond the deadline. [Record No. 7, p. 21] However, the Court does not need to consider prejudice in making the decision under Rule 37(c). *Bessemer*, 596 F.3d at 370 (explaining that "prejudice to the adversary" is a factor in the "four-part test used to determine the appropriateness of dismissal as a discovery sanction under Rule 37(b)," not Rule 37(c)). Instead, it must determine whether "there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless." *Id.* (internal quotation marks omitted). An omission is "harmless" if it involves "an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." *Vance ex rel. Hammons v. United States*, No. 98-5488, 1999 U.S. App. LEXIS 14943 at *17 (6th Cir. June 25, 1999) (emphasis omitted). Envirotech's argument focuses on not needing an expert and that "Rule 26(a)(1) relates solely to the disclosure of facts." [Record No. 71, p. 20] However, the issue is not whether Envirotech needs an expert, it is whether Envirotech failed to supplement its damages calculation when it realized it was going to do its own calculation. Envirotech does not point to any evidence that Gray should be aware of the way it calculated its delay damages and Charles admitted that Envirotech had not provided the underlying documents it used in its calculation.

Rule 37(c) states that "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially

justified or is harmless." Envirotech has not provided a justification for its failure to provide the underlying documents used to calculate its delay damages. As a result, even if delay damages were not otherwise prohibited for the reasons outlined below in subsection b., Envirotech would be prohibited from presenting evidence related to such damages.

      b.   <u>Delay damages are prohibited under Section 6.6 of the Subcontract.</u>

Gray correctly contends that Envirotech cannot bring a claim for delay damages because it is barred by a provision of the Subcontract. Section 6.6 states:

> Under no circumstance, and notwithstanding anything to the contrary herein, Subcontractor shall not be entitled to seek from Gray additional compensation or damages for actual or alleged loss of efficiency, constructive acceleration, lost productivity, stacking of trades, home office overhead, expectant underrun, season change premium, extended overhead, impact damages, quantum meruit, profit upon damages for delay or similar damages calculated by formula or trade data or studies.

[Record No. 66-1, p. 11]

No-damages-for-delay provisions are "commonly used in the construction industry and generally recognized as valid and enforceable." *John E. Green Plumbing & Heating Co. v. Turner Constr. Co.*, 742 F.2d 965, 966 (6th Cir. 1984); *see also Dynalectric Co. v. Whittenberg Constr. Co.*, 2010 U.S. Dist. LEXIS 110136 *1, *7-11 (W.D. Ky. 2010). Additionally, no damages provisions are strictly construed. *John E. Green Plumbing & Heating Co.*, 742 F.2d at 966.

Gray argues that the categories of damages Envirotech seeks are prohibited by Section 6.6 of the Subcontract. [Record No. 66, pp. 23-24] But Envirotech asserts that, because Gray refused to consider and grant Envirotech's request for extension of time, Gray's actions render the no-damages-for-delay clause unenforceable. [Record No. 71, p. 20] According to Envirotech, Gray caused multiple delays regarding matters within its control. [Record No. 71,

p. 21]  Envirotech requested an extension of time in Charles' letter to Gray on March 23, 2017. [Record No. 66-9, p. 3]  Envirotech also argues that Gray should not be able to hold Envirotech to the Subcontract that Gray allegedly breached.  [Record No. 71, p. 23]  Charles testified that the delay damages were for lost profits and lost productivity.  [Record No. 66-12, pp. 22-25]

But as detailed above, Gray did not breach the Subcontract and did not act in bad faith. Further, the Subcontract provision explicitly states that, "*[u]nder no circumstance*, and *notwithstanding anything to the contrary herein*, [the] Subcontractor shall not be entitled to seek from Gray additional compensation or damages for actual or alleged loss of efficiency, . . . lost productivity, . . .  or profit upon damages for delay. . ."  [Record No. 66-1, p. 11 (emphasis added)]  The parties mutually agreed to this provision and the Court respects the parties right to contract how they see fit.  *See Cumberland Valley Contrs., Inc. v. Bell County Coal Corp.*, 238 S.W.3d 644, 650 (Ky. 2007) ("Recognizing the importance of freedom to contract, the courts of this Commonwealth have traditionally enforced exculpatory provisions unless such enforcement violates public policy.").  Based on the foregoing, Envirotech is barred from seeking delay damages under Section 6.6 of the Subcontract.

## IV.

Accordingly, it is hereby **ORDERED** as follows:

1.     Plaintiff Gray Construction, Inc., and Counterclaim Defendant Traveler's Casualty and Surety Company of America's motion for summary judgment [Record No. 66] is **GRANTED**, in part.

2.     Summary judgment is **GRANTED** in Gray and Traveler's favor regarding the breach of contract claim contained in the Complaint (Count I).

3.      Plaintiff Gray Construction's claim for illegal lien (Count II) is **DISMISSED**, with prejudice.

4.      Defendant Envirotech's counterclaim for breach of contract (Count I) is **DISMISSED**, with prejudice.

5.      Summary judgment is **GRANTED** in Gray and Traveler's favor insofar as Envirotech cannot seek delay damages.

6.      Plaintiff Gray Construction's claims for declaratory judgment (Count III) and attorney's fees (Count IV) remain pending. Defendant Envirotech's counterclaim for foreclosure of the mechanic's lien (Count II) remains pending.

7.      Gray and Traveler's request for a hearing on damages is **GRANTED**. This matter is set for a hearing on **Monday, March 18, 2019**, beginning at **9:00 a.m.,** at the United States Courthouse in Lexington, Kentucky. The parties are directed to file pre-hearing memoranda outlining their positions regarding damages on or before **February 20, 2019**.

Dated: January 28, 2019.

Signed By:

*Danny C. Reeves*

**United States District Judge**