UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| GRAY CONSTRUCTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 17-484-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| ENVIROTECH CONSTRUCTION | ) | **MEMORANDUM OPINION** |
| CORP., | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Gray Construction, Inc., ("Gray") is seeking damages for Envirotech Construction Corporation's ("Envirotech") breach of contract arising from the construction of "More Than A Bakery" in Versailles, Kentucky (hereafter referred to as "the Project"). Gray seeks to recover the amount it had to pay to avoid mechanic's liens by Envirotech's subcontractors, the amount it paid for supplemental contractors to finish Envirotech's Scope of Work, costs associated with project delays, attorney's fees, and interest. After considering all relevant evidence presented by the parties, the Court concludes that Gray is entitled to damages in the amount of $656,335.58. Further, Gray will be awarded $12,073.00 in prejudgment interest.

**I.**

The Court has summarized many of the relevant facts in prior opinions. Those that apply to the remaining question of damages are outlined below.

Gray and Envirotech entered into a Subcontract under which Envirotech was to provide all labor and materials necessary for the installation of insulated metal panels for the Project. [Record No. 66-1] Envirotech defaulted on the Subcontract and subsequently abandoned the

- 1 -

it. [Record No. 1] Gray terminated the Subcontract on August 1, 2017, and filed suit in this Court on December 7, 2017. [Record No. 1] The Court previously granted Gray's motion for summary judgment, in part, concluding that Envirotech breached the Subcontract. [Record No. 77] All that remains to be resolved is the amount of damages, interest, and attorney's fees to which Gray is entitled under the Subcontract.

The Court held a damage hearing on March 18 and 19, 2019. Gray presented testimony, invoices, lien releases, internal e-mails, and checks to support its damage calculations. Envirotech objected that Gray's evidence was not timely disclosed and that Gray was requesting damages for payments and labor that were not within Envirotech's Scope of Work. It further asserted that there should be an inefficiency deduction for each of the four supplemental contractors hired to complete Envirotech's Scope of Work.

## II.

### A. **Motion to Exclude**

Envirotech filed a motion on April 15, 2019, to exclude evidence Gray planned to present at the hearing on April 18, 2019. [Record No. 86] It contended that certain copies of checks and internal e-mails were not disclosed during the discovery period. [*Id*.] The Court provisionally allowed the exhibits to be entered, pending briefing on the motion. Gray filed a response to the motion and argued that many of the documents were produced in discovery and, for the ones that were not disclosed, the omission was harmless. [Record No. 90]

Federal Rule of Civil Procedure 26(a)(1)(A)(iii) requires a party to provide its opposition with "a computation of each category of damages claimed by the disclosing party— who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each

computation is based, including materials bearing on the nature and extent of injuries suffered." The parties must supplement disclosures under Rule 26(a) if they are incomplete or incorrect. *See* Fed. R. Civ. P. 26(e). A party who fails to provide the information required by Rule 26(a), "is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

The test for exclusion under Rule 37(c) is "very simple: the sanction is mandatory unless there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless." *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 370 (6th Cir. 2010) (internal quotations omitted). An omission is "harmless" if it involves "an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." *Vance ex rel. Hammons v. United States*, No. 98-5488, 1999 U.S. App. LEXIS 14943 *1, *17 (6th Cir. June 25, 1999) (emphasis omitted).

Gray asserted that any delay in producing the overlooked exhibits was harmless and Envirotech has been aware of the itemized damages Gray is seeking since last summer. [Record No. 90, p. 2] Gray also argues that Envirotech is objecting to exhibits supporting damages that Envirotech already agreed Gray paid to third-parties. [Record No. 90, p. 4] Gray also noted that Envirotech was required to object by February 27, 2019, or risk waiving any objections. [*See* Record No. 90, p. 3 (citing Record No. 17, ¶ 14).] Envirotech argues in its reply that Gray tacitly admitted it did not disclose 100 documents substantiating its damages and its motion was timely. [Record No. 94] Further, it repeated that Gray cannot recover damages based on documents that were not disclosed.

Envirotech's motion to exclude will be denied because the omission of the challenged documents (certain checks and internal e-mails) was harmless. First, testimony from both Brad Piatt and Sarah Rowe during the damage hearing confirmed that payments were made by Gray regardless of the canceled checks.[1] Their testimony was supported by the invoices and lien waivers provided by Gray during the discovery process that indicated the amounts of the canceled checks.

As noted, Envirotech also claims that Gray cannot recover damages for amounts based on undisclosed documents, even though it agreed previously that Gray had paid certain contractors and suppliers. For example, Envirotech claims now that it has no proof of payment for Hayden by Gray, but had previously agreed that Gray paid $84.012.85 to Hayden. Similarly, Envirotech reduced the amount of "Gray proof of payments," even though it had previously agreed that Gray had paid greater amounts to Gott Caulking, Sunbelt, and AFAB. Lastly, Envirotech had the chance to depose Brad Piatt and discussed Gray's damage calculations during the discovery period. Therefore, the failure to disclose certain documents was harmless and the motion to exclude will be denied.

### B.  <u>Measure of Damages</u>

"[T]he measure of damages for breach of contract is that sum which will put the injured party into the same position he would have been in had the contract been performed." *Hogan v. Long,* 922 S.W.2d 368, 371 (Ky. 2009) (internal citations and quotations omitted). "Contract damages must always be proven with reasonable certainty. Thus, uncertain, contingent, and

---

[1] Even if the Court does not consider the canceled checks, there is sufficient proof of payment by Gray to support the damage award.

speculative damages are generally not recoverable." *Ford Constr., Inc. v. Ky. Transp. Cabinet*, 429 S.W.3d 397, 407 (Ky. Ct. App. 2014) (internal citations and quotations omitted).

The Court for a sister district in *United States ex rel. CKF Excavating, LLC v. ACC Constr., Inc.,* explained that the proper measure of damages would be the sum the defendant paid above the contract amount to complete performance, if it was reasonable and necessary. 2012 U.S. Dist. LEXIS 109070 *1, *14 (W.D. Ky. Aug. 3, 2012). Next, that amount would be reduced by the unpaid amount for work actually performed by the plaintiff under the contract. *Id.* (referencing *Campbell v. Snyder*, 154 S.W.2d 724, 726 (Ky. 1941) ("the measure of damages for breach of contract is the reasonable and necessary cost of complete the work according to the terms of the contract"); *Carl Const. Co. v. Miller*, 29 S.W.2d 545, 547 (Ky. 1930)).

Here, multiple provisions of the Subcontract contemplate the types of damages Gray can recover based on Envirotech's breach.

11.1 DEFAULT: NOTICE TO CURE. If the Subcontractor refuses or fails to supply enough properly skilled workers, proper materials, or maintain the Schedule of Work, or fails to achieve Substantial or Final Completion, . . . or fails to correct defective work as determined by Gray, or threatens to or refuses to perform, . . . then Gray, without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies:

> (a) supply such number of workers and quantity of materials, equipment and other facilities as Gray deems necessary for the completion of the Subcontractor's Work, or any part thereof which the Subcontractor has failed to complete or perform after the aforesaid notice, and charge the cost thereof to the Subcontractor, who shall be liable for the payment of such costs, including reasonable overhead, profit, as well as for other damages, and attorney's fees and dispute resolution costs;

> (b) contract with one or more additional contractors to perform such part of the Subcontractor's Work as Gray shall determine will provide the most expeditious completion of the total Work and charge the cost thereof to the Subcontractor;

(c) withhold payment of any monies due the Subcontractor pending corrective action or completion of the Subcontractor's Work to the extent required by and to the satisfaction of Gray;

(d) set-off Gray's damages attributable to Subcontractor's default against any monies due Subcontractor under this Agreement or under any other contract between Gray and the Subcontractor; and/or

(e) terminate the Subcontract Agreement as set forth below.

11.2 TERMINATION BY GRAY. If the Subcontractor fails to commence and satisfactorily continue correction of a default within three (3) working days after receipt by the Subcontractor of the notice issued under Section 11.1, then Gray may terminate this Agreement by written notice to the Subcontractor and its surety, if any, and use any materials, equipment and/or employ such workers or Subcontractors as Gray deems necessary to complete the Work.

All of the costs incurred by Gray in so performing the Subcontractor's Work, including reasonable overhead, profit and attorney's fees shall be deducted from any monies due or to become due the Subcontractor. The Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the subcontract price.

### a. Payments that Envirotech Agreed Gray Paid

Envirotech agreed that Gray spent $180,389.00 for equipment, labor, doors, fasteners, and miscellaneous materials from Chase, Trillum, Art's, Pro Fastening, Snodgrass, a-1 portable, Fastener Systems, Art's Rentals, Labor Works, and Parker. Originally, Envirotech agreed Gray paid Met-l Span $62,000. However, during the damages hearing, Envirotech took the position that this amount included payment for panels beyond the scope of Envirotech's work. Gray confirmed that a direct payment to Met-l Span for $62,000 was substantiated and not in dispute based on e-mails exchanged by counsel. Thus, Gray incurred costs of $242,389.00 for payments that Envirotech previously agreed that Gray had paid.

### b. Supplemental Labor

Gray is entitled to damages for paying for Envirotech's unpaid invoices to supplemental contractors and for the work done after Envirotech abandoned the Project to finish Envirotech's Scope of Work.

Envirotech CEO Janet Charles objected to Gray's damage calculations due to inefficiency of the four supplemental contractors. Charles testified during the damage hearing that she developed a 50% inefficiency factor based on past projects about a week before the hearing. Charles explained that she created the inefficiency factor by looking at her estimated man hours and bid, and then compared it to the actual hours worked on the Project. She noted that by performing this calculation she arrived at a 61% inefficiency rate; however, she then reduced the number to 50% because of the narrowness of the building. Charles was never qualified as an expert and her testimony as a fact witness stating that she never previously complained about any inefficiencies undercut her testimony developing the inefficiency factor.

And Charles never complained about the supplemental contractors' alleged inefficiencies to any of the contractors themselves or to Gray, she never asked for contractors to be moved around or kicked off the Project. Further, she never asked that the supplemental contractors not be paid due to their inefficiency. Additionally, Charles hired two of the four contractors and oversaw their work until Envirotech abandoned the Project. The only mention Charles made of potential inefficiency was in an e-mail to Piatt regarding American Igloo. [DX-006.001]

Envirotech also mentioned during the damage hearing that "trade stacking" (multiple contractors in the same space doing the same work) contributed to the inefficiency of the contractors. But Piatt explained that the Project involved a 200,000 square foot warehouse

and the supplemental contractors could be (and were) working in different areas. Piatt further testified that American Igloo was working a night shift and Delta-T was working on smaller walls and the ceiling. Also, Envirotech never complained about trade stacking until the time of the damage hearing. Based on the foregoing, the Court declines to apply the 50% inefficiency factor. As outlined above, the issue was not raised prior to the hearing, Charles was never qualified as an expert on the matter, Charles testimony does not qualify as expert testimony on the subject, and she never complained about the supplemental contractors' inefficiencies prior to the damage hearing.

The Court will now turn to each of the individual supplemental contractors.

i. <u>American Igloo</u>

The Court finds that Gray incurred $180,731.00 in costs for work performed by American Igloo. This encompasses invoices for $91,637.00 and $89,094.00. [PX-.005.009; PX-.005.013] American Igloo was hired to supplement Envirotech's work after Gray notified Envirotech of its continued default under the Subcontract.

While Envirotech objects of American Igloo's rate of $160.00 per hour, the Court finds that it was not excessive under the circumstances presented by the exigencies of the Project. Piatt testified that he attempted to locate other contractors capable of performing the required work, but American Igloo was the only entity with a knowledgeable team able to perform the work in a timely manner. Piatt noted that he advised Envirotech that American Igloo was being hired to supplement its work and that Envirotech did not object. Charles agreed that she knew American Igloo was on site, supplementing Envirotech's work at a rate of $160.00 an hour.

Charles also claimed that American Igloo damaged panels, but Piatt testified that he had no knowledge of damaged panels. However, when Charles made this claim, Piatt asked his site crew about the potentially damaged panels. The site team denied knowledge of any panels being damaged per the Charles' allegation. Charles also conceded that she never demanded that American Igloo pay for allegedly damaged panels, that she never put anything in writing about the alleged damaged panels, and that she did not say anything about the broken panels to American Igloo. Cahrles also admitted that she never made an insurance claim for the broken panels. The Court declines to make a deduction for panels allegedly damaged by American Igloo. There is insufficient proof to conclude that such damage occurred.

  ii.  Delta-T

  Gray also hired Delta-T to supplement Envirotech's work after Envirotech's abandonment of the Project. Gray paid $235,034.66 to Delta-T to cover costs incurred within Envirotech's Scope of Work. Specifically, Gray executed a lien waiver in exchange for $161,000.00 and incurred an additional $74,046.66 in expenses from Delta-T to complete Envirotech's Scope of Work.

  Envirotech briefly mentioned during the hearing that Delta-T damaged panels. However, Charles testified that she never demanded that Gray pay for panels broken or damaged by Delta-T; she merely asked Brad to negotiate a credit for the alleged broken panels.

  The Court declines to deduct any amount for allegedly damaged panels since it is unclear what panels (if any) were broken or how much they are worth. Envirotech puts forth no evidence except an e-mail asking to negotiate a credit for alleged damaged panels. Accordingly, the Court concludes that Gray spent $235,034.66 for work done by Delta-T to complete Envirotech's Scope of Work.

iii.  Hayden

Gray incurred costs of $183,789.95 for work done by Hayden.  Hayden was originally hired by Envirotech to help install metal panels.  After Envirotech abandoned the Project, Gray kept Hayden on site to help finish Envirotech's Scope of Work.  Piatt testified that Gray executed a lien waiver in the amount of $ 98,717.06 to cover Envirotech's costs before it abandoned the Project.  [PX-001.002]  ***5,380.00 is subtracted from that amount because it is outside Envirotech's Scope of Work.***  Further, Gray spent $70,452.89 to finish Envirotech's Scope of Work after Envirotech abandoned the Project.  [PX-.001.007; PX-.001-.011]  In total, the Court concludes that Gray incurred $183,789.95 in costs from Hayden Steel to finish Envirotech's Scope of Work.

iv.  Southwest Vault Builders

The Court concludes that Gray expended $211,563.40 for work done by Southwest Vault Builders within Envirotech's Scope of Work.  Southwest Vault Builders agreed to a settlement of $135,000 for a lien waiver for amounts unpaid by Envirotech.   Gray paid an additional $76,563.040 to Southwest Vault Builders to complete Envirotech's Scope of Work after it abandoned the Project.  [PX-007.17-PX-.007-.030]

**c.  Materials**

i.  Gott Caulking

The Court finds Gray spent $132,700.00 for materials from Gott Caulking.  Gott Caulking had a contract with Envirotech to caulk all the panel seams for the Project.  Gott Caulking submitted four invoices to Envirotech that went unpaid and submitted one invoice directly to Gray after Envirotech abandoned the Project.  The invoices were for $25,000,

$28,500, $30,000, $25,000, $24,200, totaling $132.700.00.  [PX-002.003-.007] Piatt testified that all of these invoices were paid by Gray.

ii. <u>Sunbelt</u>

The Court concludes that Gray incurred $85,358.57 in costs for rental equipment from Sunbelt.  Envirotech had originally contracted with Sunbelt to rent equipment for the Project.  Sunbelt contacted Gray after Envirotech abandoned the Project to notify Gray that it had not been paid in several months.  Gray executed a lien waiver and negotiated a discount with Sunbelt Rentals for $60,000. [PX-.003.003] Gray paid an additional $25,358.57 to rent equipment to finish Envirotech's Scope of Work.

Envirotech argued that it is unclear that the equipment supplied was actually necessary to finish Envirotech's Scope of Work.  But Piatt testified that the scissor lift was the same lift as the one Envirotech was using before it left the Project.  He further testified that the job duties of Gray's Site Manager (Louis Perkins) included renting equipment, keeping track of the equipment being used within the scope of work being performed, and properly coding the equipment.   Piatt also testified that no other contractors were on site for which Gray was renting this type of equipment during the relevant time period.  Based on the evidence and testimony presented, the Court concludes that the rented equipment was used to finish Envirotech's Scope of Work.

iii. <u>Applied Fabricators</u>

Gray paid $41,958.59 to Applied Fabricators.  However, the amount it paid to Applied Fabricators was not all for supplies within Envirotech's Scope of Work.  Gray settled with Applied Fabricators for the amount of $20,000.00 (representing the balance not paid by Envirotech).  The Court will reduce the amount sought by Gray by $9,851.59 for invoice items

referencing 12-gauge steel, which was outside Envirotech's Scope of Work. [PX-.004.003;.004.005] Two invoices from Envirotech include charges for items including 12-gauge steel. Testimony presented during the damage hearing indicated that 12-gauge steel was not within Envirotech's Scope of Work. Since the Court cannot discern what was spent on 12-gauge steel (versus 16-gauge steel), it will reduce the amount sought for charges referencing 12-gauge steel. In summary, the Court concludes that Gray is entitled to $32,107.00 for costs incurred from Applied Fabricators.

### iv. Jamison Doors

Envirotech originally hired Jamison Doors to supply doors for the Project. Gray spent $50,000.00 by negotiating a lien waiver with Jamison Doors to cover Envirotech's costs after it abandoned the Project. [PX-.008.010] Piatt testified that this amount was only paid because of Envirotech's breach of contract and subsequent abandonment of the Project.

### v. Foundation Building Materials

Foundation Building Materials supplied construction materials – including insulation for the Project. It was originally hired by Envirotech. Gray incurred $7,000 for costs from Foundation Building Materials. Gray negotiated a lien waiver with Foundation Building Materials in return for the $7,000. [PX-.09.017]

### d. Site Management

Gray is entitled to damages for the site management costs associated with overseeing Envirotech's Scope of Work. This work was performed by Brad Piatt and Louis Perkins. Gray seeks money for their hours worked, overhead and profit, travel, and a truck allowance.

Under both Section 11.1 and 11.2 of the Subcontract, Gray is entitled to reasonable overhead and profit regarding its damage claim. Further, overhead should be considered as

part of lost profits in calculating a damages award. *Grand Trunk Western R. Co. v. H.W. Nelson Co.*, 116 F.2d 823, 839 (6th Cir. 1941) ("In computing damages for breach of a construction contract, overhead expenses may be considered."); *see also T.A. Blair, Inc. v. Fid. Constr. Co., Inc.*, 2007 Ky. App. Unpub. LEXIS 85 *1, *24 (Ky. Ct. App. 2007) (citing *Buono Sales, Inc. v. Chrysler Motors Corp.*, 449 F.2d 715, 719-20 (3rd Cir. 1971)). Gray seeks 15% overhead and profit for both Louis Perkins and Brad Piatt, which is allowed under Kentucky law and the Subcontract. The Court will now look at the damages requested for Brad Piatt and Louis Perkins individually.

i.  Brad Piatt

Brad Piatt served as the project manager for the Project. After Envirotech abandoned the Project, Piatt spent time dealing with the Envirotech's unpaid supplemental contractors and suppliers. He also organized completion of Envirotech's Scope of Work. Piatt testified that he spent roughly 30% of the hours that Louis Perkins spent on the job dealing with Envirotech's Scope of Work, but he also calculated his hours spent after Envirotech abandoned the Project. He explained that 344.19 hours reflected the additional time he spent on the Project due to the delay and breach of contract caused by Envirotech. [PX-011] Gray requests $51,629.00 for the hours he worked and $7,744.00 for overhead and profit.

Envirotech noted during cross-examination that Piatt did not actually have a time sheet and that he speculated that the hours he worked were 30% of the time Louis Perkins worked on the Project. But Piatt explained that he arrived at 344.19 hours using 30% of the hours Perkins worked and he alternatively looked at the time he spent on the Project after Envirotech abandoned the Project. He calculated 344.19 hours and applied the standard rate for a project manager, which is $150.00 an hour.

The Court concludes that Gray incurred costs of $59,373.00 for Brad Piatt's additional time spent on the Project due to Envirotech's delays.

ii. <u>Louis Perkins</u>

Gray placed Louis Perkins at the Project site in May 2017 to oversee panel installation and track materials due to the mismanagement of Envirotech. He worked 911 hours on the Project from May to November (he was not on site in June due to medical issues). Gray also requests damages for a truck allowance and travel expenses incurred by Perkins. Further, Gray requests overhead and profit for Louis Perkins. Gray seeks $142,097.00 for costs sustained by having Perkins on site overseeing Envirotech's Scope of Work. [PX-10]

Piatt testified during the damage hearing that Perkins worked 911 hours at a rate of $125.00 per hour. The $125.00 per hour amount was the standard rate for a site manager and also includes fringe benefits. Piatt further testified that Perkins' sole mission was monitoring the completion or the installation of work that fell within Envirotech's Scope of Work. Envirotech questioned the fact that nothing on Gray's Exhibit 10 references Envirotech. However, Piatt testified on cross-examination that Perkins was only on the job to manage Envirotech's work. The Court concludes that Gray spent $142,097.00 to have Perkins on site to oversee Envirotech's Scope of Work due to its mismanagement and subsequent abandonment of the Project.

**e. General Conditions**

Gray submitted a document requesting $170,741.00 for general conditions impacted by the two-month delay caused by Envirotech. "The measure of damages for delay in the performance of a construction contract is the actual loss sustained by reason thereof and the

burden rests on the contractor to show by a fair preponderance of the evidence the actual or proximate amount." *Grand Trunk Western R. Co.,* 116 F.2d at 837.

> Under construction law, . . . [d]elay damages refer to damages arising out of delayed completion, suspension, acceleration or disrupted performance; these damages compensate the contracting party that is injured when a project takes longer than the construction contract specified. Typical contractor delay damages include the costs associated with increased labor and materials, extended job-site and home-office overhead, laying off and rehiring work crews, loss of efficiency of work crews who have to work around delayed projects, loss of alternative construction job opportunities, or items such as rental equipment, utilities, and site securities.

*Louisville & Jefferson County Metro. Sewer Dist. v. T+C Contr., Inc.,* 2018 Ky. LEXIS 538 *1, *31-32 (Ky. 2018) (internal citations and quotations omitted).

It is unclear what constitutes general site conditions from the face of the document. Piatt testified that general condition costs included overhead on-site costs, direct costs for site management, temporary facilities and temporary utilities. He further testified that the two numbers represented the costs between September 21, 2017 (the original date of substantial completion) and November 13, 2017 (the actual date of substantial competition). He also testified that he removed the cost for Louis Perkins so that Gray would receive a double recovery.

Envirotech questioned whether Gray needed to engage an expert or consultant in calculating the delay damages and whether the delays were on the critical path. The defendant cites *MACTEC, Inc. v. Bechtel Jacobs Co.*, LLC, 346 F. App'x 59, 74 (6th Cir. 2009), for the proposition that expert testimony is necessary to determine delay damages in construction cases because a critical path analysis is required.

It is true that courts use a critical path analysis to calculate delay damages in complex construction projects. *Id.*; *see also Youngdale & Sons Constr. Co. v. United States*, 27 Fed. Cl.

516, 550 (Fed. Cl. 1993).   The court in *MACTEC* noted that the critical path method is the most accurate way to calculate delay damages and explained that:

> to calculate delay damages, it is necessary to determine which work items on the . . . project were in the critical path and the time period that these work items remained on the critical path. The reason that the determination of the critical path is crucial to the calculation of delay damages is that only construction work on the critical path ha[s] an impact upon the time in which the project was completed . . . . Delay involving work not on the critical path generally has no impact on the eventual completion days of the project.

*Id.* (quoting *Youngdale*, 27 Fed. Cl. at 550).   However, the court did not hold that a critical path method is the only method to calculate delay damages.   Additionally, the court in *MACTEC, Inc.* noted that "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact."   346 F. App'x at 77 (quoting *Davis v. Combustion Engineering, Inc.,* 742 F.2d 916, 919 (6th Cir. 1984)).

Other courts have found that expert testimony and the use of a critical path method are not always necessary for calculating delay damages in construction settings.  *See Acme Contr., Ltd. V. TolTest, Inc.*, 2008 U.S. Dist. LEXIS 363355 *1  (E.D. Mich. 2008), *aff'd in part by Acme Contr., Ltd. v. TolTest, Inc.,* 370 F. App'x 647, 651 (6th Cir. 2010) (noting the CEO and Director of Operations testified to delays and scheduling of the construction project); *see also Suitt Constr. Co. v. Ripley's Aquarium, LLC,* 108 F. App'x 309, 315-16 (6th Cir. 2004) (allowing for recovery of general condition costs for a 79-day delay without the use of an expert).   Here, Piatt (who has taken scheduling classes and has a degree in construction management) testified that no other contractor caused a delay so he compared the costs between the two completion dates – the original date of substantial competition and the actual date of substantial completion.   He also took into account a 30-day weather delay.

This is not a complex calculation: only one contractor caused a delay. An expert would not additionally assist the Court in understanding the requested damages for delay caused by Envirotech. Therefore, it is not necessary to engage an expert to utilize a critical path method to calculate delay damages. The Court concludes that Gray is entitled to $170,741.00 in general condition costs for the delay caused by Envirotech.

### f. Insurance

Gray was required to obtain a release of the mechanic's lien filed by Envirotech, and Gray contracted with a surety for the bond. Gray now requests damages for the money spent on the bond. Section 14.1(c) of the Subcontract allows for indemnification for "claims against or through Gray or liability for claims and liens for labor performed or materials used or furnished through or under the Subcontractor on the Project." Gray incurred costs of $15,571.00 to bond off the mechanic's lien and it is entitled to recover that amount in damages from Envirotech.

### g. Attorney's Fees

Gray also is entitled to attorney's fees. Under the American Rule, each side pays its own attorney's fees "with the exception of a specific contractual provision allowing for recovery of attorneys' fees." *Aetna Cas. & Sur. Co. v. Commonwealth*, 179 S.W.3d 830, 842 (Ky. 2005); *Asher v. Unarco Material Handling*, *Inc.,* 862 F. Supp. 2d 551, 558 (E.D. Ky. 2012). Gray and Envirotech included a provision for attorney's fees in their contract.

> 17.4 ATTORNEYS' FEES. The Subcontractor shall reimburse Gray for all of Gray's attorney's fees, court costs and other expenses incurred in enforcing or declaring the Subcontractor's obligations under this Agreement, incurred in exercising any right or remedy hereunder or under law or equity in the event of a default by the Subcontractor, or incurred in any litigation or arbitration in which Gray, without its fault, becomes involved by reason of the existence of this Agreement.

[Record No. 66-1, p. 17] "In diversity cases, an attorney's entitlement to fees is governed by state law." *Western Kentucky Royalty Trust v. Armstrong Coal Reserves, Inc.,* 2013 U.S. Dist. LEXIS 79375 *1, *4 (W.D. Ky. June 6, 2013) (referencing *Hometown Folks, LLC v. S&B. Wilson, Inc.*, 643 F.3d 520, 533 (6th Cir. 2011). Kentucky allows for recovery of reasonable attorney's fees. *Capitol Cadillac Olds, Inc. v. Roberts*, 813 S.W.2d 287, 293 (Ky. 1991).

Various courts within the district have used the lodestar method in calculating reasonable contractual attorney's fees. *See GATX Corp. v. Appalachian Fuels*, LLC, 2011 U.S. Dist. LEXIS 81832 *1, *7 (E.D. Ky. July 8, 2011) (referencing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), *adopted by GATX Corp. v. Appalachian Fuels, LLC*, 2011 U.S. Dist. LEXIS 81865 (E.D. Ky. July 26, 2011); see also Crestwood Farm Bloodstock, LLC v. Everest Stables, Inc.*, 2013 U.S. Dist. LEXIS 45446 *1, *6 (E.D. Ky. Mar. 29, 2013). The lodestar is the number of hours reasonably expended multiplied by a reasonable hourly rate. *Northeast Ohio Coalition for the Homeless v. Husted*, 831 F.3d 686, 702 (6th Cir. 2016) (citing *Hensle*y, 461 U.S. at 433). The calculation may be adjusted based upon "various special factors in the litigation." *Meyers v. Chapman Printing Co., Inc.*, 840 S.W.2d 814, 826 (Ky. 1992). Factors considered in adjusting the amount include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Geier v. Sundquist*, 372 F.3d 784, 792-93 (6th Cir. 2004) (quoting *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 718-19 (5th Cir. 1974)).

A party seeking attorney's fees must "demonstrate that the amount sought is not excessive and accurately reflects the reasonable value of bona fide legal expenses incurred." *A & A Mechanical, Inc. v. Thermal Equip. Sales, Inc.*, 998 S.W.2d 505, 514 (Ky. Ct. App. 1999). The burden is on Gray to show that the hourly rate is reasonable and that the number of hours expended is reasonable. *See Blum v. Stenson*, 465 U.S. 886, 897 (1984). "A district court may look to a party's submissions, awards in analogous cases, state bar association guidelines, and its own knowledge and experience in handling similar fee requests" in determining what is reasonable. *Ne. Ohio Coal. for the Homeless*, 831 F.3d at 716 (internal citations and quotations omitted).

Based upon the plaintiff's affidavit, awards in similar cases, and the Court's own knowledge and experience in handling similar fee requests, the undersigned concludes that the plaintiff's requested attorney's fees are reasonable. The Court, therefore, will award $148,215.00 in attorney's fees to Gray.

### h. Interest

In a suit based on diversity, the question of prejudgment interest is determined by state law. *L-S Indus. v. Matlack*, 448 F. App'x 597, 598 (6th Cir. 2012). Kentucky Revised Statute 360.040 provides:

> (1) Except as provided in subsections (2), (3), and (4) of this section, a judgment, including a judgment for prejudgment interest, shall bear six percent (6%) interest compounded annually from the date the judgment is entered. A judgment may be for the principal and accrued interest.
> . . .
> (3) A judgment rendered on a contract, promissory note, or other written obligation shall bear interest at the interest rate established in that contract, promissory note, or other written obligation.

(4) When a claim for unliquidated damages is reduced to judgment, such judgment may bear less interest than six percent (6%) if the court rendering such judgment, after a hearing on that question, is satisfied that the rate of interest should be less than six percent (6%). All interested parties must have due notice of said hearing.

"Prejudgment interest is recoverable as a matter of right on liquidated claims, but the award of interest on unliquidated claims is within the discretion of the court. . ." *Harman & Conway v. Nucor Corp.*, 1989 Ky. App. LEXIS 127 *1, *16 (Ky. Ct. App. 1989); *see also State Farm Mut. Auto. Ins. Co. v. Reeder*, 763 S.W.2d 116, 119 (Ky. 1988); *Nucor Corp. v. General Electric Co.*, 812 S.W. 2d 136, 141 (Ky. 1991). Liquidated generally means "made certain or fixed by agreement of parties or operation of law." *Nucor Corp.*, 812 S.W. at 141 (quoting BLACK'S LAW DICTIONARY 940 (6th ed. 1990)). Further, "[l]iquidated claims are of such a nature that the amount is capable of ascertainment by mere computation, can be established with reasonable certainty, can be ascertained in accordance with fixed rules of evidence and known standards of value, or can be determined by reference to well-established market values." *3D Enters. Contr. Corp. v. Louisville & Jefferson County Metro. Sewer Dist.*, 174 S.W.3d 440, 450 (Ky. 2005) (internal citations and quotations omitted).

The Restatement Second of Contracts 354, "Interest as Damages," states:

(1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.

(2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

Gray submitted its damages calculations and requested 6% interest compounded annually from June 20, 2018, through April 15, 2019. [Record No. 93] It asserts that the

prejudgment interest became liquidated from the date each check was signed. [*Id*.] The total amount of prejudgment interest Gray requests is $121,077.00. [*Id*.] Envirotech asserts that the damages amount is unliquidated and the Court should decline to exercise its discretion in granting prejudgment interest. [Record No. 95]

The Court concludes that the damages on the disputed claims were not liquid until the date of the judgment because they could not be established by mere computation, with reasonable certainty, or in accordance with fixed rules of evidence and known standards of value, or by reference to well-established market values. *See Doyle v. Doyle*, 549 S.W.3d 450, 456 (Ky. 2018) (noting the Court's damages award came from the trial court's classification and could not have been predicted with any amount of certainty). The Court declines to grant an award of prejudgment interest on the unliquidated amounts.

However, the undisputed amounts became liquid on June 20, 2018, through an agreement of the parties. Envirotech previously agreed that certain amounts had already been paid by Gray. The Court used the following formula to calculate the amount of prejudgment interest on the liquidated amounts: Principal x Annual Interest Rate / Days in a Year x Number of Days Liquidated = Interest Due.[2] The total interest for the undisputed amount through April 19, 2019, is $12,073.00 for payments made to Chase, Trillium, Art's, Met-l Span, Pro Fastening, Snodgrass, a-1 portable, Fastener Systems, Art's rentals, Labor Works, Parker.

### i. Calculating Total Damages

The amount that Gray paid after Envirotech abandoned the contract to finish Envirotech's Scope of Work is $1,895,971.58. Adding that to the $2,129,455.00 that Gray

---

[2] For example, the Court calculated $3,187.72 in prejudgment interest for Chase using the formula 64,000 x .06 / 365 x 303.

already paid to Envirotech equals $4,025,427.58. Then subtracting the contract price of $3,369,092.00 from the total amount Gray paid equals $656,335.58, which is the amount of damages to put Gray back into the position it would be in if Envirotech had not breached the Subcontract. Additionally, Gray is entitled to receive $12,073.00 in prejudgment interest through today's date. Accordingly, Gray is entitled to a total damage award of $668,408.58.

## III.

Being sufficiently advised, it is hereby

**ORDERED** as follows:

1.      Envirotech's Motion to Exclude [Record No. 86] is **DENIED**.

2.      Gray is awarded $656,335.58 in damages.

3.      Gray is awarded $12,073.00 in prejudgment interest.

Dated: April 19, 2019.

Signed By:

*Danny C. Reeves*

United States District Judge